IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JONATHAN McINTYRE,

    Petitioner,               No. CIV S-05-2508 FCD GGH P

A.P. KANE, et al.,

    Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1982 petitioner was convicted of first degree murder, attempted kidnapping for robbery and conspiracy to kidnap for the purpose of robbery. Petitioner was sentenced to 25 years to life for the murder conviction, and the sentences on the other two counts were stayed.

        In the original petition filed December 12, 2005, petitioner challenged the 2003 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole – his fourth suitability hearing. Petitioner argues that the decision finding him unsuitable was not supported by sufficient evidence. In the answer, respondent addresses petitioner's 2004 suitability hearing. Because the arguments made in respondent's answer are equally applicable to

the 2003 decision by the BPT, the court will not require respondent to file a supplemental answer.

      After carefully reviewing the record, the court recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

      The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

      In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

      "Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application

of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

On June 2, 2004, the Stanislaus County Superior Court issued a reasoned opinion denying petitioner's habeas petition raising the same claims which are raised in the instant action. Answer, Exhibit C. Petitioner filed habeas petitions in the California Court of Appeal and California Supreme Court which were summarily denied. Id., Exhibits D and E. When

reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

III. Background

The factual background of petitioner's offense is relevant to the analysis of petitioner's claims. A factual summary is contained in the transcript from petitioner's 2003 suitability hearing.

> According to the probationary officer's report dated 5/12/1982, John Byron Crahan, C-R-A-H-A-N, was murdered in front of his home on December 1, 1981. The cause of death was a 22 caliber gunshot wound in the chest. Craham was a teacher at Downey, that's D-O-W-N-E-Y, High School. On or about November 6, 1981, Jonathon McIntyre, Stony Hunt and Earl–Chuck Earl, E-A-R-L, and Hunt is spelled H-U-N-T, met and talked about Crahan. Hunt said he had been propositioned by Crahan to engage in homosexual activity, and that Crahan had a lot of money. The three talked about blackmailing Crahan. Subsequently, McIntyre contacted Crahan by telephone and stated–contacted Craham by telephone and stated he would expose Crahan's homosexual activities if Crahan would not pay him money. In the latter part of November, McIntyre went to Hunt's residence and requested Hunt to set up a meeting with Crahan. Later that afternoon, McIntyre (inaudible) returned to Hunt's residence to request Crahan's address. At that time, Hunt's brother-in-law, David Flasher, F–Fischer, F-I-S-C-H-E-R, was present. He overheard McIntyre, Earl and Hunt left [sic] Hunt's house and drove by Crahan's house on Hunt's motorcycle.
>
> *****
>
> Fisher attempted to locate Crahan's home to warn him of the plan to kidnap Crahan or his mother. He actually spoke to Crahan three times about it, and also spoke to Crahan's mother. Approximately one week before Crahan's death, McIntyre, Earl went to the We Donut Shop, that's capital W-E, where Crahan had–was known to frequent. Earl went in and talked to Crahan about five minutes while McIntyre waited outside. Crahan wrote a letter to Hunt mentioning McIntyre's name stating that he was aware of a plot to kidnap his mother, and the location–and that local and federal law enforcement agents had been informed. Crahan contacted the local sheriff's department and reported the kidnap plot. McIntyre read Crahan's letter to Hunt. He telephoned Crahan who suggested to stage a kidnapping–to stage a kidnapping in case the Mafia asked where the extortion money Crahan was planning to pay McIntyre had gone. Crahan allegedly set the time for the kidnap at 6:00 a.m. on December 1, 1981. McIntyre claimed Crahan agreed to pay one million dollars. About–on or about November 29, 1981, at approximately 1:30 a.m., McIntyre talked with Jack Britt, B-R-I-T-T, about participating in a kidnap. And he told Britt that Hunt and Earl was just going along for the ride, and that Crahan was going to go along with things. Britt and Hunt agreed to carry guns. McIntyre was to have handcuffs. On December 1,

1981, at approximately 1:30 a.m., McIntyre, Hunt, Earl and Britt met at Hunt's residence. They left in Hunt's Vega at approximately 2:30 a.m. to find an orchard in which to meet after the kidnapping. McIntyre admitted that the plan was to take Crahan's truck keys. McIntyre would drive the truck, and Crahan would be handcuffed and forced to lie on the floor board of the truck. When they got to the orchard, they were going to tell Crahan to give them some money. Basically, they drove to the alley behind Crahan's residence. Britt and McIntyre left the vehicle, walked to Crahan's back fence and climbed over it. McIntyre directed Britt to walk down the driveway and hide behind Crahan's truck while McIntrye stayed near the garage area. McIntyre heard Britt yell, "hold it right there." McIntyre then saw Crahan had a gun. Crahan fired at McIntyre who turned and ran and jumped over a fence. As he ran away, he heard more shots being fired. McIntyre caught up with Hunt's vehicle and asked to be taken home. Later Britt informed McIntrye that he had shot Crahan.

Petition, Exhibit L, pp. 12-17.

IV. <u>Discussion</u>

Since the approximate five years since the issuance of <u>McQuillion v. Duncan</u>, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

1. A liberty interest exists, <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007) citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest. <u>Biggs v. Terhune</u>, 334 F.3d 910, 916 (9th Cir. 2003);

3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; <u>Irons</u>, at *5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. <u>Rosenkrantz</u>, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1095,

23 Cal. Rptr. 3d 417, 440 (2005);

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons at *5, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted. Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors. Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time. The state courts' adoption of the BPH (BPT[2]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term. That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment

---

[1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

[2] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term.[3]

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case. Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs. He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime. All might agree that such a murder was grave, and it will never be properly classified as anything but such. Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process. Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much. Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much would occur in 2010 – the time at which Biggs will have served his minimum term. Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time. However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity

---

[3] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record. See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005). That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal. In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005). However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness. The Ninth Circuit was reviewing a third denial of suitability. If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility. What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why? Will the fourth hearing be sufficient, or should it be the seventh? Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence? Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term? None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in Sass. Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country. Both positions have their points. But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from Irons that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

/////

In the instant case, the BPH found petitioner unsuitable for parole for the following reasons: 1) the offense was carried out in a dispassionate and calculated manner; 2) the offense demonstrated an exceptionally callous disregard for human suffering; 3) the motive for the offense was inexplicable or trivial; 4) petitioner had an escalating pattern of criminal conduct as a juvenile; 5) petitioner had an unstable social history prior to his incarceration. Petition, Exhibit L, pp. 73-74.

At the time of the 2003 suitability hearing petitioner, convicted in 1982, had not served his minimum term of 25 years. Therefore, the BPH's reliance on unchanging factors to find him unsuitable constituted some evidence sufficient to deny parole suitability. Because circumstances of the crime alone can constitute some evidence, there is no point in discussing the other factors of parole suitability.[4]

The denial of petitioner's claim challenging the sufficiency of the evidence to support the 2003 decision by the BPH finding him unsuitable for parole by the Stanislaus Superior Court was not an unreasonable application of the due process law surrounding parole suitability hearings.

*Conclusion*

If the undersigned were reviewing this matter on a clean slate, the undersigned would not analyze the liberty interest involved merely by reference to a checklist of crime circumstances and whether the BPH understood that a murder was serious. Nevertheless, no binding authority at present would require more than use of the checklist for the circumstances of the crime factors as "some evidence" upon which to deny parole suitability.

/////

---

[4] Rosenkrantz also required that the then BPT also make an individualized consideration of the other factors regarding parole suitability. Of course, the Commissioners always make such a determination as the Commissioners know that they must. Whether these determinations are supported by some evidence is another matter, but as long as the consideration is made, the circumstances of the crime are sufficient to deny suitability.

1 | Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for
2 | a writ of habeas corpus be denied.
3 | These findings and recommendations are submitted to the United States District
4 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
5 | days after being served with these findings and recommendations, any party may file written
6 | objections with the court and serve a copy on all parties.  Such a document should be captioned
7 | "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
8 | shall be served and filed within ten days after service of the objections.  The parties are advised
9 | that failure to file objections within the specified time may waive the right to appeal the District
10 | Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
11 | DATED: 5/16/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

14 | mcintyre.157